UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Eugene Collins,<br>    *Plaintiff*,<br><br>        *v.*<br><br>Connecticut Job Corps, and Career System<br>Development Center,<br>    *Defendants.* | Civil No. 3:07cv991 (JBA)<br><br><br><br>February 8, 2010 |

RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Eugene Collins sued his former employers, Connecticut Job Corps and

Career System Development Center (collectively, "Defendants" or "Job Corps"), claiming

that Defendants unlawfully demoted him from his position as facilities manager because of

his age and race and then fired him in retaliation for reporting their unlawful conduct.  His

complaint alleges these actions violated Title VII of the Civil Rights Act of 1964 ("Title VII"),

the Age Discrimination in Employment Act (the "ADEA"), and the Connecticut Fair

Employment Practices Act (the "CFEPA").[1]  Defendants have moved for summary judgment

on these claims, arguing that they demoted and discharged Plaintiff for legitimate,

nondiscriminatory reasons.  Collins counters that Defendants did not follow their own

stated procedures in demoting and firing him, that they treated him less well than other

younger, white facilities managers, and that their course of conduct after his demotion and

---

[1] Plaintiff also alleged negligent infliction of emotional distress, but on December 15,
2008 the Court granted Defendants' Motion for Judgment on the Pleadings as to this claim.

leading to his discharge reflects retaliation for his formal and informal complaints of discrimination.

For the reasons discussed below, Defendants' motion will be denied.

I.       Facts and Background

         A.       Introduction

Because the summary-judgment record is extensive, a brief overview of the factual basis in the record—taken in the light most favorable to Collins[2]—for Plaintiff's claims is provided before that record is examined in detail.

Collins worked at Connecticut Job Corps, a facility in New Haven run by the Career Systems Development Corporation.[3] Supervisors who promoted Collins, who was then a 52-year-old African American, from maintenance mechanic to facilities manager were concerned about his managerial skills and promised him training to address some of these perceived deficiencies.  However, he did not timely receive the three-month evaluation referenced in his offer of promotion, and despite a standard practice and policy of giving employees training, feedback, and time and opportunity for improvement, at his first

_____

[2] The Court will apply the familiar summary-judgment standard without recitation in detail.  *See* Fed. R. Civ. P. 56(c)(2); *see also, e.g., Davis v. City of Hartford*, 601 F. Supp. 2d 488, 491 (D. Conn. 2009) (reciting standard).

[3] Defendants explain in their briefing that "Job Corps is a State and Federal Department of Labor program, providing education and vocational training for at risk and disadvantaged youths between the ages of 16–24.  Career Systems Development Corp contracts with the Department of Labor to run the New Haven Job Corps facility."  (Defs.' Mem. Supp. [Doc. # 81] at 2.)

evaluation, which came five months into his six-month probationary period, he was found to need improvement in every evaluative area and was immediately demoted.  He countered that he had not been afforded training that he and they knew he needed.  The record reveals that his predecessor and successor each received training.  The record further reveals no discipline being taken against the previous facilities manager (a younger white man), and reveals that his successor (also a younger white man) received numerous written warnings and opportunities for improvement during his probationary period before he left Job Corps's employ.

After his June 2005 demotion, Collins filed grievances and complaints of age and race discrimination both formally and informally, both internally and externally.  After receiving notice of Collins's complaints, Collins's supervisors began meeting more frequently with him, charged him with aggressive and volatile behavior and fraternizing with a student, and after consulting with counsel offered to reinstate him as facilities manager.  When Collins learned that despite the offered reinstatement he would still be reprimanded on the charge of aggressive behavior and would be subjected to "immediate termination of employment" for "any further inappropriate behavior," he declined reinstatement and formally and informally complained about these meetings and reprimands.  Collins's supervisors re-examined the reprimands they had placed in his personnel file, and in October 2005 offered to removed some of them, but not the charge of fraternizing, which the employee handbook listed as a dischargeable offense.

In November 2005, his supervisors faulted him for a second incident of fraternizing with a student based on conduct unrelated and dissimilar to the first charge of fraternization, having never defined what fraternization includes, and despite having previously imposed discipline for fraternization only in more egregious cases. They fired him on November 17, 2005.

B.      The Record[4]

In greater detail, and taken in the light most favorable to Plaintiff, the record reveals the following:

Collins, who is African-American, began working for Job Corps in March 2004, when he was 52 years old. Steve O'Sullivan—a white man who was then the facilities manager at Job Corps and who was 37 when he was hired into that position—hired Plaintiff as a

---

[4] The record exists in five parts and will be cited as follows: Affidavit of John Hamilton in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Hamilton Aff. [Doc. # 86]). Exhibits to the Declaration of Anthony B. Corleto in Support of Defendants' Motion for Summary Judgment [Doc. # 82] and to Defendants' Memorandum in Reply to Opposition (Defs.' Reply Supp. [Doc. # 92]) will be cited as "Ex. Defs.–[letter]." Exhibits to the Affidavit of Allison M. Near in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Near Aff. [Doc. # 85]), which are numbered, will be cited as "Ex. Near–[number]." Exhibits to the Affidavit of Eugene Collins in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Collins Aff.") will be cited as "Ex. Collins–[letter]."

Excerpts of five witnesses' depositions constitute more than one exhibit. Collins's deposition appears at Exs. Defs.–A, Defs.–B, and Defs.–Z. Tami Schweikert's deposition appears at Exs. Defs.–D and Near–2. Marvel Sawyer's deposition appears at Exs. Defs.–F, Defs.–Y, and Near–1. Alta Hester's deposition appears at Exs. Defs.–O and Near–23. Darlene Perez's deposition appears at Exs. Defs.–Q, Defs.–AA, and Near–4.

maintenance mechanic and was Plaintiff's supervisor.  (Collins Aff. at ¶¶ 3, 4, 6; Sawyer Dep. at 10.)

Job Corps's human resources manager, Darlene Perez, testified that while the maintenance department was under O'Sullivan, "[t]here were some difficulties.  The appearance of the Center was not up to par," and O'Sullivan did not effectively manage the student support coordinator, who held "some of the accountability" for the difficulties. Under O'Sullivan the maintenance department also had trouble completing work orders in a timely fashion, but Perez did not recall any discipline being imposed on O'Sullivan for this deficiency.  Tami Schweikert, the director of the New Haven Job Corps facility,  found O'Sullivan to be a "[p]retty intense guy" who "[d]idn't always follow the rules."  (Perez Dep. at 54–56; Schweikert Dep. at 64.)

On two occasions, John Longo, Job Corps's former facilities manager, who preceded O'Sullivan, found O'Sullivan engaging in "romantic escapades in the dormitories that [Longo] visually saw with [his] own eyes where [he] had to use a key to get into a building and walked in on them."  In response, Longo "put O'Sullivan on notice both times and made the center director aware of it" because he believed that the behavior "was not acceptable . . . when you have children and you are charged with the responsibility of the safety and welfare of these children."  Although Longo told Schweikert of these incidents, O'Sullivan "was never disciplined."  (Longo Dep., Ex. Near–21, at 77; Defs.' Responses to Requests for

Production, Ex. Near–3, at 8 (noting that Longo preceded O'Sullivan as facilities manager); Collins Aff. at ¶ 8.)

When O'Sullivan left Job Corps in November 2004, Collins applied for and was named the acting facilities manager, reporting to Marvel Sawyer and Laverne Williams, then the acting co-directors of administration.  The record contains nothing regarding any Job Corps evaluation of Plaintiff's work while he was a maintenance mechanic or acting facilities manager.  On January 12, 2005, when Collins was 52, Laverne Williams proposed to Schweikert by memo that Job Corps "offer the position of Facilities Manager to Eugene Collins," with a 5.9 percent raise conditioned on his ability to perform certain managerial tasks associated with the position.[5]  Ms. Williams' memo recognized that while Collins was ready to take over the facilities department, he needed substantial training to successfully perform a number of his new responsibilities.  The memo stated:

> In a short amount of time Collins has started the task of building relationships within the maintenance dept., as well as with other departments.  I believe if additional training [is] provide[d] in the areas [related to the managerial tasks], he should be able to meet all requirements

---

[5] Specifically, these managerial tasks addressed

his ability to grasp all budgeting controls for the maintenance departmental budget, ability to work closely with the purchasing agent on contacting vendors in regards to Construction Rehab projects (negotiations, best pricings, best solutions, project regulation requirements), input into the development of VST (Vocational Skills Training) projects, creating and tracking of all reporting requirements such as ( Energy Consumption, Vehicle Mileage, other as assigned).

(Proposal, Exs. Defs.–C and Collins–B, at 1.)

by the end of his six month probation period.  There will be an evaluation completed at the three month interval.

On January 24, 2005 Plaintiff was hired as Job Corps's first African-American facilities manager.  (Collins Application for Acting Facilities Manager, Ex. Collins–A, at 1; Proposal, Exs. Defs.–C and Collins–B, at 1; *see* Collins Aff. at ¶ 17; Employment Offer dated Jan. 24, 2005, Ex. Collins–C, at 1; *cf.* Sawyer Dep. at 9.)

At the time Collins was promoted to facilities manager, Schweikert had serious doubts about Plaintiff's ability to complete the managerial tasks of the position—she called him "borderline" qualified for the position—and indeed, Williams's proposal indicated that to "meet all requirements" of the position Plaintiff required "additional training."  Perez expected that Collins would receive training, at least, "on reporting requirement such as energy consumption and vehicle mileage."  Sawyer testified that it was "normal procedure" for a new hire to be sent to training.[6]  Perez also testified that it was Job Corps's "standard" practice to evaluate each new hire after 90 days .  (Schweikert Dep. at 27, 30–31; Proposal at 1;  Perez Dep. at 60, 210; Sawyer Dep. at 108; *see also* Collins Aff. ¶ 13.)

In February 2005, soon after Collins was promoted, Williams left the position of acting co-director of administration and Sawyer took over as the director of administration. Perez testified that as director of administration, Sawyer was responsible for both ensuring

---

[6] Longo testified that Job Corps had asked him to travel for two weeks of off-site training, but he chose not to go because the campus was "going to be undergoing at the time a physical examination from corporate headquarters, and [he] was told, 'We need you bad. We got to get this place straightened out.'"  (Longo Dep. at 14.)

that each new hire received and completed all appropriate training, and implementing each employee's growth and development plan.  Consistent with Perez's testimony that training would sometimes take the form of visits to other sites operated by the Career System Development Center—as well as with the experiences of O'Sullivan, who went to trainings in New York, and Plaintiff's successor, Pat Ciareglio, who was sent to San Diego for training—Collins avers that Williams told him "that [he] would be sent to another Job Corps facility for training."  (Sawyer Dep. at 9, 108; Collins Aff. at ¶¶ 13, 19; Perez Dep. at 59–60, 62, 210.)  Collins never received any training, and "was told that [he] could not attend training until [Job Corps] w[as] fully staffed."  (Collins Aff. at ¶¶ 27, 29, 31; Memo Dated April 8, 2005, Ex. Collins–D, at 1; *see* Perez Dep. at 88.)

Although O'Sullivan had supervised a staff of four full-time maintenance mechanics and had access to students from carpentry, when Collins took over as facilities manager he "had only one part-time maintenance mechanic (John Longo)," so he "would contact [a temp agency] for temporary workers," but these workers "often had no maintenance experience."  Collins notified Sawyer that he was short-staffed and Schweikert knew that Collins was short-staffed, but Sawyer never hired additional mechanics to work under Collins.  In addition, although O'Sullivan had been able to interview facilities-department applicants and make recommendations to his supervisor, Collins was required to recommend to a panel the applicants he interviewed and wished to hire, and none of his recommended applicants were hired.

Documents and testimony show Job Corps management to have been unhappy with Collins's performance as facilities manager.  In an April 12, 2005 memo documenting a "walking tour[] of the center" that she had "recent[ly]" conducted, Schweikert observed areas in need of improvement.  Schweikert's walk-throughs were thorough: Perez testified that in Schweikert's memoranda of her walking tours "[a]ll areas were addressed."  In the memo, which she sent to Job Corps's managers and directors, including Sawyer but not Collins,[7] Schweikert grouped four problems under the "Facility Maintenance" heading: the "unacceptable" nature of "[t]he entire street from our main entrance to the bridge," "old posters," water fountains in need of inspection and repair, and nonfunctioning "[o]utside lighting" that caused "a safety hazard and supervision nightmare."  (Perez Dep. at 76; Schweikert Memo, Ex. Defs.–E and Near–6, at 1–2.)

On another occasion, Schweikert arrived at the center to find that Collins had trimmed trees outside the center's entrance and then painted the trees in "colors that are not tree colors," such as "red or blue."  Sawyer testified that she discussed the trees with Collins and told him that "it was incorrect to do that."  According to Schweikert, Sawyer knew of the problem, and had been "hoping to get the trees fixed before [Schweikert] came to visit."  But according to Plaintiff, while he was asked what he had done, he "was not told [he] was doing

---

[7] The Schweikert Memo listed five recipients: Michelle Boyle, the Social Development Director; Danielle Chiaraluce, the Career Development Director; Marvel Sawyer, the Finance and Administration Director; Sharon Simmons, the Safety and Security Manager, and Darlene Perez, the Human Resource Manager.  (Schweikert Memo at 1.)

anything wrong."  No documentation of the incident appears in the record.  (Schweikert

Dep. at 37–38; Sawyer Dep. at 87–88; Collins Aff. at ¶¶ 22, 23; *see also* Maroney Dep., Ex.

Near–5, at 35 (explaining that trees that are painted "will receive less damage"); Longo Dep.

at 26–27 (same).)

    Job Corps managers were also concerned that Collins used outside vendors too

frequently.  Schweikert testified that she frequently saw trucks from Roto-Rooter, whose

employees came to the center to unclog toilets.  She "just felt like historically [Job Corps]

hadn't had Roto-Rooter on campus all the time and [she] felt like they were there every day."

She raised the matter with Sawyer but not Collins, does not know if Sawyer thereafter

discussed it with Collins, and did not see a change in how frequently Roto-Rooter trucks

were on campus after her discussion with Sawyer than before.  Sawyer testified that the

center owned a plumber's snake that could be used to unclog drains, but as facilities manager

Collins did not "need approval" to call in a vendor like Roto-Rooter to perform "normal,

routine maintenance."  Collins avers that "no one ever told [him] that [he] was using

vendors too frequently," and there is no evidence in the record that anyone spoke with him

about his use of vendors even though in Schweikert's experience Collins followed directives

he was given.  (Sawyer Dep. at 88–89; Collins Aff. at ¶ 26; Schweikert Dep. at 39.)

    Collins never received the three-month evaluation reflected in Williams's January

2005 memo to Schweikert.  According to Collins, he had no notice that Sawyer or Schweikert

were unhappy either with his performance generally, or the tree and vendor issues

specifically.  Sawyer testified that she and Job Corps "always" provide an employee an "opportunity to fix his deficiencies," and that all the feedback he received would have been in his personnel file.  (Sawyer Dep. at 118.)  The record reveals nothing in his file addressing any aspect of his performance from anyone in management prior to June 13, 2005.

On that date, Sawyer gave Collins a written performance evaluation in which she stated that he needed improvement in all six areas of evaluation.  Sawyer found that Collins was "inconsistent in modeling core values" because he was "judgemental" [*sic*] and complained to human resources about her "lack of support" for him; that he did not "envision[] 'the bigger picture'" because "he is reactive and very defensive when challenged, . . . does not always confront issues as they occur," and does not "seek[] resolution with respective parties"; that he suffered on "[a]ccountability" because while he "does tasks as requested, . . . work orders are not always done in a timely manner"; that he needed further "[o]rganizational [d]evelopment" because he "seldom creates alternatives for upcoming needs (seasonal)," has not eliminated confusion between the maintenance and security departments, and failed to develop "co-hesiveness [*sic*] with other departments"; did not demonstrate "[f]iscal [r]esponsibility" because he "ha[d] difficulty analyzing and preparing budget reports" and used temporary rather than full-time staff; and, finally, that he needed improvement in his "[c]apacity to [d]evelop" because while he "demonstrate[d] a willingness to learn and grow[,] . . . he is clearly overwhelmed with the increasing demands of the

center" and "need[ed] to learn how to monitor the center's [e]nergy [c]onsumption and how to do the reporting."  The evaluation listed no "[a]ccomplishments."

The next day, Collins responded to these criticisms, acknowledging receipt of the evaluation but "disagree[ing] with [its] content."  He further noted that he had "not had any training," and that Sawyer "shows [him] no desire to help [him] succeed []or improve as a manager"; he suggested that Sawyer "communicat[e] to [him] her needs," explained that "[he is] more than willing to be train[ed] in whatever areas necessary," and stated that "[he was] promise[d] training but never received it, and now [he is] being penalize[d] for not fully meeting [Sawyer's] expectations."

In this evaluation Sawyer recommended in her June 13th evaluation that Collins be demoted "back to his original position of [m]aintenance [m]echanic."  She concluded her evaluation by stating: "It is my decision to return you to the position of maintenance mechanic, effective 6/27/05, with a growth and development plan that will provide you support for future opportunities."  William Maroney, whose race and age are not revealed in the record, was named the acting facilities manager.  (Performance Assessment, Ex. Defs.–G and Collins–E, at 1–6, 5, 7–11; *e.g.*, Ex. Defs.–L.)

After his demotion, Collins filed formal and informal complaints about his treatment.  On June 29, 2005, he filed an internal corporate "Dispute Resolution Form" in which he complained that "[his] supervisor did not give [him] a three month evaluation, inform[] [him] of any deficiencies (which was required)," that he "was not evaluated until

12

the fifth month of a six month probationary period," that he "was not given training," and concluding that he "strongly fe[lt] that [he] know[s] he that [he had] been <u>targeted</u> and <u>set up</u> for <u>failure</u>" (emphasis in original). He asked for reinstatement "with the proper tools that [he] need[s] to be able to do [his] job." In letters written in June 2005,[8] he filed complaints with other individuals as well. To Scott Dunham, a member of the Career System Development Center's corporate office, he expressed concern that he "ha[d] been discriminated against" in light of his having been "the first afro American (Black) to have held this management position" and the "preferential treatment shown towards previous white managers compared to myself," including that "[t]raining, assistance, and support w[ere] provided to white managers in order to help them be successful," while he had "been denied this opportunity." And to Congresswoman Rosa DeLauro and Grace Kilbane, whom he described as the "National Director" of the "US Department of Labor," he wrote letters "regarding [Job Corps's] bias[,] promotional practices, racial discrimination, and violation of rights to equal opportunity" as well as "preferential treatment . . . that has benefited previous white managers [but] denied [him] as a black manager." Schweikert, Perez, and Sawyer knew about Collins's grievance and letters,[9] Perez and Sawyer consulted with counsel

---

[8] His letters are dated June 11, 2005, preceding his June 13th evaluation and demotion. In his brief Plaintiff suggested that they were misdated (*see* Pl.'s Opp'n [Doc. # 84] at 12 n.11), but at oral argument suggested that he wrote them when he learned that his demotion was imminent.

[9] (*See* Schweikert Dep. at 88, 90 (noting that Sawyer spoke to Schweikert and Schweikert spoke to Dunham); Sawyer Dep. at 73 ("I was made known" of "the first thing" in which Collins "contested" his demotion); *id.* at 99 ("I was made aware of the letter [to

on July 8, 2005 regarding Collins, to which counsel responded by letter dated July 26th.

(Owl Global Dispute Resolution Form, Ex. Defs.–S and Collins–F, at 1 (emphasis added);

Exs. Collins–G, Collins–H; Letter from Counsel dated July 26, 2005, Ex. Collins–BB, at 1[10]).

Thereafter, the relationship between Collins and Job Corps managers devolved

further.   On Friday, July 1st, Perez, Sawyer, and Maroney reprimanded Collins for an

incident that had occurred Monday June 27th, when Collins, driving in his "own vehicle"

home from work and "a couple miles away from the center," saw a "visibly upset" student

who said "she was lost."  Collins drove the student, Ruth Ortega, back to the center.  On July

1st, Ortega wrote that she appreciated what she described as the "favor" Collins had done

for her.  At the July 1st meeting Sawyer "kept asking [Collins] questions" about the incident,

and told Collins that he had fraternized with Ortega, conduct that the Career Systems

Development Corporation employee handbook lists as a "dischargeable offense[]" without

---

Congresswoman DeLauro] by human resources"); *id.* at 101 ("I knew he was contesting his demotion" in the letter to Dunham); Perez Dep. at 137 (she became aware of Collins's grievance in June 2005); *id.* at 139–40 (acknowledging she saw a copy of Collins's letter to Rep. DeLauro "around the same date as on the letter, [or] maybe two or three days" afterward); *id.* at 140–41 (noting that she sent fax to corporate on June 30, 2005, called the matter "urgent," and was likely referring to Collins's letter to Rep. DeLauro or Dunham).)

[10] At oral argument the parties stipulated to the fact and date of the legal consultation, Plaintiff agreed to rely on those two facts but not the content of the legal advice, and Defendants consented to Plaintiff's pending Motion to Seal the July 26th letter [Doc. # 88], which Plaintiff had filed under seal as a precaution to protect Defendants' attorney-client privilege.  However, Defendants thereafter "waive[d] the attorney-client privilege" and stated that "[t]he document may be unsealed for the purposes of summary judgment and used at trial."  (Defs.' Reply to Mot. Seal [Doc. # 95] at 1.)  Therefore, the motion to seal will be denied.

defining it.  (*See* Collins Aff. at ¶¶ 49–51; Statement of Ortega, Ex. Defs.–J and Near–12, at 2; Employee Handbook, Ex. Defs.–P and Near–12, at 5; Schweikert Dep. at 95; Hamilton Aff. at ¶ 15 (as Job Corps employee, would not have known that Collins's conduct was "forbidden").)

Also at that meeting, Sawyer asked Collins about his work in changing a lock "about a month and a half earlier."  The parties dispute what happened during this incident. According to Plaintiff, he and Longo "decided to change the locks because [they] discovered a credit card was missing and [they] were concerned about theft," and because he was short-staffed Collins asked carpentry students to replace the lock.  When he learned that they had incorrectly installed it, he and Longo "fixed" it.  Collins avers that "Sawyer was aware [they] had changed the locks, but did not say anything about it until [the July 1st] meeting." According to Collins, Sawyer "was very aggressive and condescending toward" him.  (Collins Aff. at ¶¶ 30, 52.)

A week later, on July 8th, Perez held a conference call with counsel to consult about Collins, and thereafter sent counsel "copies of Collins['s] personnel file."  On July 18th, before further reply from counsel, Perez, Sawyer, and Boyle held another meeting with Collins and he "was again questioned about giving the student a ride and changing the locks, even though [they] had already discussed these issues in the July 1 meeting."  They also told Collins that he "was being counseled for aggressive behavior toward Ms. Sawyer in the meeting on July 1."  (Collins Aff. at ¶ 54.)

The next day, Collins was off-campus for much of the day, having gone to hardware stores at Maroney's earlier request to find "a special long screw that connects a joint and a pipe."  Returning to campus after failing to find the part at two stores, the company truck he was driving broke down.  After getting help and lunch, he returned to the center and explained the series of events to Maroney.  He explained that he did not call Job Corps to explain his prolonged absence to anyone because his cell phone had been "taken away from [him] when [he] was demoted."  Upon his return, Sawyer met with Collins and "again . . . confronted [him] about the student ride and changing the locks" as well as his prolonged absence.  Collins further avers: "I was not aware of any policy that required me to call and check in when I went out to get a part.  In fact, when O'Sullivan was facilities manager, he would often be away from [the] center for long periods of time, and no questions were ever asked."  There was no policy requiring an employee "to call multiple times while he's away from the center."  (Collins Aff. at ¶¶ 55–59; Sawyer Dep. at 109, 142; *see also* Maroney Dep. at 56 (before July 19th, Collins had never "been absent for a period of time without an explanation," but he did not believe Collins's story); Schweikert Dep. at 109 (same).)

At the July 19th meeting Sawyer wrote Collins a memorandum, placed in his personnel file, that listed two of his "[p]olicy [v]iolations"—picking up Ortega and changing locks without authorization.  Collins disputed that these incidents were improper.  (*See* Ex. Defs.–H and Collins–L.)

Two days later, on July 21st, acting facilities manager Maroney attended a union meeting from which management was excluded, and then wrote a memo to Sawyer and Perez recounting the July 1st, 18th, and 19th meetings and noting that at the union meeting he saw "Collins become extremely loud and visibly angry during discussions with other female employees." Maroney acknowledged that "this action took place during a scheduled and approved union meeting and may not be reportable," but reported it anyway on either Sawyer's or Perez's instruction.  In a cover memo to what appears to be a copy of Maroney's memo, an executive administrative assistant wrote to Boyle, then the acting center director, and opined that she "believe[s] that there is a possibility that Collins could pose a safety risk."  Another staff member and union member wrote an e-mail to another staff member and union member stating that Collins had become "irate" at the union meeting and opined that "if driven or motivated enough Collins would act outlandish and seemingly out of control."  (Maroney July 22nd Memo, Ex. Near–17, at 2; Ciskowski Memo to Boyle, Ex. Defs.–U, at 1; Green E-mail to Simmons, Ex. Defs.–V, at 1.)

On July 22nd, Sawyer and two other managers[11] issued Collins a written reprimand for "[g]ross insubordination and failure to carry out a reasonable directive by a management representative."  The reprimand listed Collins's "volatile" or "aggressive" behavior during three meetings on July 18th, 19th, and 21st, and concluded that along with his conduct at the

---

[11] These other two managers were the acting human resource manager, Keisha Taliaferro, and the acting center director.  Schweikert may have been on maternity leave.

July 1st meeting, Collins' "behavior has been observed to be a pattern." Sawyer suspended Collins for "three . . . working days without pay," instructing him to "return to work on" July 27, 2005, and noted that his "[f]ailure to adhere to the above corrective actions will result in further disciplinary actions up to and including termination of employment." (Ex. Defs.–I and Collins–M, at 1–2.)

In the meantime, on July 26th, Perez, Sawyer, and Boyle received a response to their request for advice from counsel  regarding Collins.  Counsel noted that "the vast majority of issues documented within Collins' file appear to be interpersonal/communication related, and in many instances, he appears to have a plausible or bonafide response." (Letter from Counsel dated July 26, 2005, at 1–2.)  The next day, when Collins returned from his three-day suspension, Sawyer, Perez, and acting center director Boyle offered to reinstate him as facilities manager by letter acknowledging his complaint that his "overall training . . . was insufficient" and "agree[ing] to provide" four forms of specific, "[f]ormalized" training. The letter did not mention Collins's behavior.  Collins asked for time to consider the offer. (Letter from Counsel dated July 26, 2005, at 1–2; Offer of Reinstatement, Ex. Defs.–J and Collins–N, at 1–3.)

At 4:00 p.m. on July 28th, Collins "indicated verbal acceptance of reinstatement." However, 45 minutes later, he received a "final written reprimand" dated July 27th regarding his behavior during "the week of July 18, 2005," which had already "resulted in a 3-day suspension."  Collins refused to sign the final written reprimand.  By 5:00 p.m. Collins had

withdrawn his acceptance of the reinstatement offer, which Perez noted was "subsequent to a conversation regarding his volatile behavior." (Reinstatement Offer at 1–3; Final Written Reprimand, Ex. Defs.–W and Collins–O, at 1–2.)

The next day, July 29th, Collins wrote to Scott Dunham again, complaining that "the conduct and behavior of upper management is absolutely absurd and ridiculous," stating that he "d[id] not have a clue as to what" his managers had accused him of doing wrong, and explaining that "because of this Administration['s] constant harassment, false accusations, making ever[y] attempt to try to humiliate and trying to destroy [his] character [he] could not accept re-instatement." He stated that he "really need[s] for [his] grievance to go to the next level." On August 4th, he wrote another letter to Rep. DeLauro stating that "[i]t is quite obvious that I am being retaliated against because I am standing firm for my equal rights," and also wrote to Job Corps's human resource department, asserting his "right to file a grievance due to unfair labor practice[] and preferential treatment that benefits a preferred race and not the other," and thereby seeking to amend grievances he said he filed on July 22nd and 29th. On August 24th, he wrote to the EEOC regional office in Boston to complain that he "ha[d] been discriminated against on [his] job because [he is] black/male over the age of fifty, and treated differently in comparison to previous white males that held the same position." He asserted that his "demotion is in direct violation of Title 7 of the Civil Rights Act of 1964, the [A]ge in Discrimination in Employment Act, including Race, Gender, and bias promotional practices," and that he is "being harassed, targeted, and

19

retaliated against for complaining against these issues." He sent a carbon-copy to Schweikert.[12] (Second Letter to Dunham, Ex. Defs.–T and Collins–P, at 1; Second Letter to DeLauro, Ex. Collins–Q, at 1; Letter to HR Dep't, Ex. Collins–R, at 1; Letter to EEOC, Ex. Collins–S, at 1.)

On September 2, 2005, the president of Collins's union wrote on his behalf to Perez to reject her offer, made at an August 29th meeting, "to reduce his suspension from three days to two; to withdraw [her] July 29 Final Written Reprimand, and to delete from your July 22 Written Reprimand reference to events that occurred on July 21" because her offer would not "result[] in a just settlement of the matter." The same day, Collins wrote to Dunham, complaining that despite corporate's determination that his "demotion was handled unfairly" and its "suggest[ion] that [he] be re-instated," and despite Dunham's August 22nd site visit—during which he "asked [Collins] if [he] had been reinstated yet" and then "arranged a meeting with Ms. Schweikert"—at his August 22nd meeting with Schweikert, she did not discuss re-instatement, and the scheduled "follow-up meeting . . . was canceled." Four days later he filed an Affidavit of Illegal Discriminatory Practice with the CHRO, which the CHRO acknowledged to Collins and to Job Corps on September 19,

_____

[12] Schweikert asserted in a reply to Rep. DeLauro's inquiry that "Collins' claims of bias promotional practices, racial discrimination and violation of rights to equal opportunity are completely false and unfounded," and detailed Job Corps's pride in its "diversity." (Ex. Collins–W.)

2005.  (Wilkenfeld Letter to Perez, Ex. Collins–T, at 1; Exs. Collins–U, Collins–V, and

Collins–W.)

The next month, on October 19, 2005, Schweikert wrote to Collins "[p]er [their]

recent meeting regarding [his] suspension," telling him that she removed the Final Written

Reprimand from his file; "changed the suspension documentation to indicate" a suspension

of two, not three, days; "removed the language on the suspension documentation" relating

to Collins's conduct at the July 21st union meeting; and upheld his two-day suspension for

what she concluded was his "grossly insubordinate" behavior at the July 19th meeting, which

along with his behavior at the July 1st and 18th meetings demonstrates his "failure to carry

out a reasonable directive by a management representative."  (Schweikert Letter, Ex. Defs.–X

and Collins–Y, at 1.)

November 2005 was Collins's last month with Job Corps.  On November 10th Collins

saw a "five dollar bill" on campus "near" a student, Alta Hester, and asked her if it was hers.

She said no, but he tried to insist that she take it anyway, which she declined, and he said

that "he would come back [the next day] to check up on [her]."  When Hester then saw

Collins the next day, it "made [her] feel very, very awkward" because she had told him that

she would not be on campus.  Hester then spoke with security officer Annie Clark, who told

her to write a statement.  In her statement Hester wrote that Collins "asked [her] to take

some money from him and [she] told him no it was [$5] and he was still asking [her] to take

the [$5] from him and [she] was saying no he told [her] he would come back tomorrow to

check up on [her]."  She then filed the statement with Clark, who in turn reported their November 11th discussion.  At her deposition in April 2009 Hester testified that on November 10, 2005 Collins had said "[t]hat he would buy [her] a bottle of liquor" and that she told Clark about it, but Clark testified that she could not recall but doubted that Hester told her of an alcohol offer because she would have reported it.  Hester testified that no one followed up with her about her written statement, but Perez testified that she did, and that Hester described her conversation with Collins as being "'Hello.' 'Good bye.' And that they had something about living down south in common," and that Perez "asked [Hester] in her own words what happened, and [the written report] is what she said to me."  Neither Hester's nor Clark's November 2005 written reports, nor any documentation in Collins's file, mentions alcohol.  (Hester Statement, Ex. Defs.–M and Near–18, at 1; Security Incident Report by Annie Clark, Ex. Defs.–N and Near–19, at 1 (describing Hester's oral report to her); Hester Dep. at 15, 25, 29, 42; Clark Dep., Ex. Near–22, at 55; Perez Dep. at 162–63.)

"On the morning of November 15, 2005, [Collins] was called into the human resources office, and was informed that a report had been filed about a five dollar bill."  He explained that he was on campus to bring "breakfast to [his] girlfriend," another Job Corps employee, and to discuss the possibility of his working extra shifts for a residential manager at the center.  Collins was then told to go home pending the outcome of the investigation into the incident.  Although Schweikert knew that he often came to campus to bring his girlfriend breakfast, Perez, Sawyer, and Schweikert determined that Collins's version of

events—*i.e.*, that he simply found the money on the ground—was not compelling.  Perez disbelieved Collins because she thought no money would stay for more than a moment on the ground on a campus of "two hundred some odd students" who "all want money." Schweikert thought it was "logical" that if "Collins [found] $5 on the ground" he would offer it to a nearby student, but opined that "if he found money on the ground, [and] he didn't know who it belonged to, [then] he should have returned it to his supervisor," especially because "[h]e had already received a reprimand."  Sawyer did not address the credibility of Collins's story, but suggested that he should have "give[n] [the money] to security" if the student said it was not hers.  (Sawyer Dep. at 162–63; Schweikert Dep. at 126–27, 128; Perez Dep. at 159, 161; Collins Aff. at ¶¶ 81–83; Ex. Defs.' Ex. L and Collins–Z.)

Although the employee handbook lists "[b]orrowing or lending money or personal property to students" as a dischargeable offense, Schweikert testified that employees do not receive any training regarding "what exactly that entails."  Sawyer further testified that Collins's conduct was "fraternization" because "why [else] would you come back to see the student?"  Other than Collins, there were three the other instances of termination for fraternization: once, in June 2004, an employee was fired for failing to investigate an "unsafe and inappropriate" weekend "hotel escapade" where students engaged in "alcohol consumption, alleged drug use, sexual activity, etc."; second, where a student had gone to an employee's home, the employee was suspended; and in July 2005, an employee was "terminated for fraternization, gross negligence and compromising the safety of 20 students

and 3 staff member[s]" at the employee's "private cookout without appropriate authorization." (Ex. Near–13; Ex. Near–14; Employee Handbook at 5; Schweikert Dep. at 127; Sawyer Dep. at 162; Perez Dep. at 149.)

Collins was fired on November 17, 2005. Schweikert could not recall "ever [having] discharged or disciplined anybody for borrowing or loaning money to a student." In a "termination notice," Pat Ciarleglio (who had since taken over as facilities manager), Sawyer, Perez, and Schweikert informed Collins that he was being fired for "fraterniz[ing] with students on or off Center" property and "[b]orrowing, [l]ending money," each of which warranted immediate discharge. The notice explained:

> Based on the results of the investigation launched on Monday 11/14/05 for the reported allegations of offering a student money ($5 dollars) on Center which is a clear violation of CSD Company policy (fraternization/Borrowing and/or lending Money. . .) and noted as the 2nd violation documented (1st issued and acknowledged – July 19, 2005 memorandum), your action were [*sic*] inappropriate, unacceptable and in clear violation of company policy. Your employment is being terminated effective today, Thursday, 11/17/05 for the above stated findings.

Although it was "[n]ot typical[]" for employees to be "escorted out by security when they are fired," Collins "was escorted out of the building by security in front of students and other employees." (Schweikert Dep. at 128; Termination Notice, Ex. Defs.–R and Collins–AA, at 1; Schweikert Dep. at 132; Collins Aff. at ¶¶ 84, 85.)

In the meantime, to fill Plaintiff's facilities manager position, on October 5, 2005 Schweikert and Sawyer hired Ciarleglio, a 38-year-old white man. After his arrival, the facilities manager no longer had responsibility for writing purchase requests; now, the

maintenance mechanics (a position to which Collins had returned until fired) were responsible for this work.   On Sawyer's recommendation and pursuant to "what [Defendants] normally do," Job Corps sent Ciarleglio to training in San Diego,[13] where Ciarleglio missed half a day of training and gave an excuse that Sawyer found illegitimate. Collins avers that Ciarleglio took "a female Job Corps employee with him on the trip" to San Diego.  Sawyer, who thought Ciarleglio was a "good manager," could not remember whether she disciplined Ciarleglio for missing the training, and the record reveals no imposition of discipline.  (Collins Aff. at ¶¶ 42, 43; Sawyer Dep. at 102, 107–09, 111; Schweikert Dep. at

---

[13] Sawyer testified that could not remember when, exactly, Job Corps sent Ciarleglio to San Diego:

> A.   I don't recall the dates.  I can't. . . . It depends on when he was hired. I really don't know when he went.
>
> Q.   Tell me this: How soon after he was hired did he go to training?
>
> A.   I can't recall.  But normally what we do, once they're working and they're familiar with the center, stuff that needs to be—because you don't want to send them to training a week or two after they're hired. Because most of the basic things you expect them to come into that position with that knowledge.
>
> But what it is, if you work on the center, then you know what your center really needs.  So that's when you go to the other center as the manager.  You're able to see, you now what, I need help with my heating system or I need help with this.  And another manager can kind of walk you through.  So probably whatever the supervisor deem[s] as enough time.

(Sawyer Dep. at 108–09.)

77–78; *see also* Longo Dep. at 25–26 (Ciarleglio's absence from training "was more or less just dismissed as a ha-ha, you know, big deal").)

Perez and Schweikert were dissatisfied with Ciarleglio.  Schweikert testified that Ciarleglio was "not responsive" and that during his tenure "[t]hings weren't getting done and he wasn't getting back to people."  Perez testified that although Ciarleglio "[p]resented well," he "eventually demonstrated [that] he was unable to meet the needs of the Center, and that Sawyer, who was "responsible for initiating any discipline against hi[m]," informed her that he was frequently late to work, and that she had "talked to him about it."  (Schweikert Dep. at 74; Perez Dep. at 117–19.)

Consistent with Sawyer's testimony that "[w]e always" provide employees "another opportunity to fix his deficiencies" (Sawyer Dep. at 118), Job Corps did not immediately fire Ciarleglio.

Six months after his hiring, Sawyer and Perez issued Ciarleglio a written warning on March 24, 2006 for failing to give "clear directives" and communicate the Center's "expectations" to a staff member who had frequently arrived late to work.  The warning further stated that "[s]imple tasks like replacing paper towel rolls in the appropriate dispensers and replenishing toilet tissue should never be a repeat request by any staff member," and imposed on him corrective action that is illegible in the record.  (Written Warning, Ex. Near–7, at 1–2.)  Ciarleglio was not fired or demoted, and his six-month probationary period ended on April 5, 2006.

On May 25, 2006 Sawyer issued Ciarleglio a 10-item corrective action plan that provided him with "a guideline of some of [his] job duties that [he] will need to complete within the next thirty days."  The plan observed, *inter alia*, "[d]eficiencies in all dorms," including broken locker handles, doors, window latches, and fixtures; the lack of "a preventive maintenance plan" to ensure "that routine maintenance work will be done in a timely manner"; and the need to hire at least one person into "the [m]aintenance [m]echanic position that is open."  (Ciarleglio Corrective Action Plan, Ex. Near–9, at 1.)

Six days later, at Ciarleglio's review on May 31, 2006 for the six-month period ending April 5, 2006, Sawyer rated him, as she had rated Collins in 2005, as "[n]eed[ing] [i]mprovement" in each of the six areas for evaluation—including in modeling core values—as well as on an overall basis.  However, unlike in her evaluation of Collins, Sawyer listed two "[a]ccomplishments": his having "completed training at the San Diego Job Corps Center," and his having "completed Core Values and Staff Training in December." (Ciarleglio Personnel File, Ex. Near–8, at 3–9.)

Ciarleglio apparently did not improve.  On July 26, 2006, Sawyer and Perez issued Ciarleglio a final written warning that noted previous instances in which Ciarleglio had been given feedback.  The final written warning stated that in addition to the May 25, 2006 corrective action plan, Sawyer had "informed [him] on various occasions of deficiencies in your department" (on July 20, 2006, regarding a lack of air conditioning and his subsequent "fail[ure] to communicate this information" to the Center, resulting in their inability "to

activate a back up plan," and on July 21, 2006, regarding his "fail[ure] to provide [needed] supplies" to other staff members).  Notwithstanding this prior feedback and opportunities for improvement, in their final written warning Sawyer and Perez stated they were "inform[ing] [him] that if [his] productivity and performance level don't improve within the next two weeks, further disciplinary actions up to and including termination will occur." (Final Written Warning, Ex. Near–10, at 1–2.)  The record does not reveal when Ciarleglio left Job Corps's employ, but he eventually did, and was replaced in the facilities manager position by Gregory Edmonds, a 38-year-old African American, about whose behavior, performance, and supervision the record is silent.

## II.    Discussion

### A.    Employment Discrimination

Plaintiff brings his claims of race and age discrimination[14] under the ADEA, 29 U.S.C. §§ 621 *et seq.*, Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the CFEPA, Conn. Gen. Stat. §§ 46a-60 *et seq.*  Claims of race and age discrimination under these statutes "are governed by the *McDonnell Douglas* three-part burden shifting framework."  *Zubrow v. Solvay Pharms., Inc.*, 207 F. App'x 37, 38 (2d Cir. 2006) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)), and *Sample v. Wal-Mart Stores, Inc.*, 273 F. Supp. 2d 185, 189 (D. Conn. 2003)

---

[14] For convenience, the Court will refer to Collins's demotion-related claims under the ADEA, Title VII, and CFEPA as a single claim of discrimination because the differences are not material for its summary-judgment analysis.

(citing *Brittell v. Dep't of Corr.*, 247 Conn. 148, 164 (1998) (CFEPA and Title VII are "coextensive"))).  First,

> [a] plaintiff alleging a violation of [these] statute[s] must establish . . . a prima facie case consisting of four elements: (1) that plaintiff falls within the protected group, (2) that plaintiff applied for a position for which he was qualified, (3) that plaintiff was subject to an adverse employment decision and (4) that the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination.

*Byrnie v. Town of Cromwell*, 243 F.3d 93, 101–02 (2d Cir. 2001) (citations omitted).  Collins has clearly established a *prima facie* case.  As an African-American man over age 40, he is protected by all three statutes.  He applied for, and was promoted to, the position of facilities manager, for which Schweikert described him as qualified (albeit "borderline").  It is also beyond cavil that a demotion, which Collins received on June 13, 2005, is an adverse employment action.  *See, e.g.*, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009). And Job Corps's replacement of Collins with Ciarleglio, a 37-year-old white man, is a "circumstance[] giving rise to an inference of unlawful discrimination."  *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citations omitted) (the burden on the plaintiff is "'minimal' and 'de minimis,' and the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the . . . analysis.").

Defendants argue that no jury could conclude that "there is [a] logical connection between [Plaintiff's] claims of discrimination and any adverse employment action" because he "points to no race or age related remarks or speech that could lead a trier of fact to find

29

that race and age were the reasons for demotion and termination." (Defs.' Mem. Supp. at 21.) This argument misunderstands the basic nature of the *McDonnell Douglas* test, which the Supreme Court crafted to effectuate Congress's intent that laws to which the burden-shifting test is applicable "tolerate[] no . . . discrimination, *subtle or otherwise*." *McDonnell Douglas Corp.*, 411 U.S. at 801 (emphasis added). The *McDonnell Douglas* is "designed to assure that the plaintiff [has] his day in court *despite the unavailability of direct evidence*." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (emphasis added). This is "because proof is seldom available with respect to an employer's mental processes," so "plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." *Carlton*, 202 F.3d at 135 (citation omitted).

At oral argument Defendants focused on the "same actor inference" against discrimination, which the Second Circuit has reasoned may apply because "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Defendants agreed that if

the Court found the same-actor inference inapplicable to this case, summary judgment should be denied on Plaintiff's discrimination claim.[15]

As Plaintiff correctly notes that the Second Circuit has not "pass[ed] judgment on the extent to which [the same-actor] inference is either required or appropriate outside the . . . ADEA[] context in which it generally is applied," *Feingold v. New York*, 366 F.3d 138, 155 n.15 (2d Cir. 2004), Plaintiff's discrimination claims are brought under both the ADEA as well as Title VII.   This Court will follow "[d]istrict courts within the Second Circuit[, which] have applied [the same-actor] rationale to Title VII claims," *Woodard v. Monticello Cent. School Dist.*, Civ. No. 1:06cv13361(KMK), 2008 WL 5062125, *14 (S.D.N.Y. Dec. 1, 2008) (collecting cases).

Nonetheless, "as several courts have found, the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the Court would not be compelled to give [the defendant] the benefit of the inference at [the summary-judgment]

---

[15] At oral argument Defendants also suggested that the Court should be skeptical of Collins's claim of race discrimination because Sawyer, like Plaintiff, is African American. But the Second Circuit has rejected the "suggestion that an inference of discrimination cannot be drawn" when the plaintiff and his employer are members of the same protected group. *Feingold v. New York*, 366 F.3d 138, 155 (2d Cir. 2004) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)).  In *Oncale*, the Supreme Court held:

> in the . . . context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race.  "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."

523 U.S. at 78 (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)).

stage of the litigation." *Memnon v. Clifford Chance US, LLP*, --- F. Supp. 2d ----, 2009 WL

3459188, *13 (S.D.N.Y. 2009) (citations omitted); *see also Copeland v. Rosen*, 38 F. Supp. 2d

298, 305 (S.D.N.Y. 1999) ("The 'same actor' inference is not a necessary inference, it is only

a plausible one, and decisions in this Circuit addressing it have warned that its use is not to

become a substitute for a fact-intensive inquiry into the particular circumstances of the case

at hand." (citing, *inter alia*, *Grady*, 130 F.3d at 560)).  Moreover, "the inference alone is

generally not a sufficient basis to grant summary judgment for the employer, at least when

the employee has proffered evidence of pretext," *Masters v. F.W. Webb Co.*, No.

03-cv-6280L, 2008 WL 4181724, *6 (W.D.N.Y. Sept. 8, 2008), as Plaintiff has done here, or

where there are "changes in circumstances during the course of [the plaintiff's]

employment," *Feingold*, 366 F.3d at 155, as there were here.

   Furthermore, from the record presented application of the inference in this case does

not seem appropriate.  First, while "most cases dealing with this inference involve situations

where the same actor hired and fired the individual complaining of discrimination,"

*Santiago v. Gen. Dynamics Elec. Boat Div.*, No. 3:04-cv-2062 (JCH), 2006 WL 3231413, *5

(D. Conn. Nov. 7, 2006) (declining to apply inference where plaintiff "alleges incidents of

disparate treatment that do not include termination"), Collins's discrimination claims

involve *neither* his hiring *nor* his firing, which actions were in any event not taken by the

same people.  (O'Sullivan hired him, while Ciarleglio, Sawyer, Perez, and Schweikert fired

him.)  Even if the "same actor" inference were more broadly applicable, Collins's claim is

premised on his promotion and subsequent demotion, and he was not promoted and demoted by the same people. The Second Circuit has declined to apply the inference where, as here, the supervisors who allegedly "recommended [a plaintiff's] termination for discriminatory reasons" were not, "[t]echnically speaking," the people who hired him. *Feingold*, 366 F.3d at 155 & n.16. Williams proposed Plaintiff's promotion to Schweikert, while Sawyer completed the evaluation and demoted him. Although Schweikert was Job Corps's director at the time of the promotion and demotion, she testified that she was not actively involved in Collins's promotion even though she had to sign off on it, and Sawyer's June 13th evaluation states that "[i]t [wa]s *my decision* to" demote Plaintiff.

In addition, the same-actor inference is inapplicable here because Plaintiff's supervisors' failure to provide him the training that they knew he needed constitutes a supervisor-created "change[] in circumstances during the course of" Plaintiff's tenure as facilities manager: he went from being a person who they thought could perform the work if they trained him to being a person who they thought could not perform the work because they had not trained him. The denial of training also demonstrates that Schweikert's approval of Williams's recommendation that Plaintiff be promoted cannot carry the inference against her having discriminated against him that might be drawn in a typical same-actor-inference case: her skepticism of his qualifications was grounded in what was, in her view, his lack of ability in the very areas in which the proposal recommended he be

trained, and her subordinates thereafter failed to provide him training, with Sawyer determining there would have been no point.

For these reasons, the same-actor inference is inapplicable here, and Collins has established a *prima facie* case of discrimination.  The "burden therefore shifted to [Job Corps] to produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted).  Defendants have met this burden of production.  Job Corps asserted that Collins was demoted for legitimate, nondiscriminatory reasons: Sawyer found his skills and leadership lacking in six areas of evaluation as well as on an overall basis, provided examples of his failures under each area, and concluded that he "lack[ed] the necessary managerial skills to meet the demands of the Center."  (Ex. Defs.–G and Collins–E.)

The parties' main dispute is whether Plaintiff has adduced evidence sufficient for a reasonable jury to conclude that Defendants' proffered nondiscriminatory reason for Collins's demotion was merely pretextual.  In asserting that he has not, Defendants argue that Plaintiff "cannot establish pretext by pointing to the treatment of his predecessor and successor as evidence of discrimination" because "[t]here is no evidence that th[e] alleged difference in treatment was related to [Plaintiff's] claims of race or age discrimination," and they insist that "Collins simply quarrels with the business judgment of an employer who

determined that training for the preparation of management reports and 'shadowing' at another facility would not have corrected [his] basic incompetence." (Defs.' Mem. Supp. at 23.) They conclude that Plaintiff's "disagreement with Job Corps['s] decision not to provide training is nothing more than an attempt to supplant Job Corps business judgment." (*Id.*)

Defendants' insistence that Collins provide evidence directly relating the difference in treatment to his race or age puts misplaced reliance on the business judgment rule. "[W]hile the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility." *Byrnie*, 243 F.3d at 105 (internal quotation omitted). Collins's attack on Job Corps's credibility takes the form of his supervisors'—and especially Sawyers's—failure to apply to him what they testified were standard policies and practices. Although under the business judgment rule the Court "do[es] not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII," the ADEA, and the CFEPA. *Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 313 (2d Cir. 1997) (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)). A plaintiff "seeking to show that forbidden purposes lurk in [an employment] decision have available methods of challenging such decisions. Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may

reasonably affect the decision." *Zahorik*, 729 F.2d at 93; *see also Weinstock*, 224 F.3d at 45 (quoting *Stern* quoting *Zahorik*).

Plaintiff's supervisors substantially departed from what they described as regular procedures a number of times in their oversight of Collins.  First, although Perez testified that it was Job Corps's "standard" practice to evaluate each new hire after 90 days, and Williams's proposal to promote Plaintiff included an evaluation after three months, neither Sawyer nor Plaintiff's other supervisors gave him such an evaluation.  Second, although Williams's proposal acknowledged that Collins would require training to successfully perform a number of his managerial responsibilities, Perez expected that Collins would receive at least some training, and Sawyer testified that it was "normal procedure" for a new hire to be sent to training, Collins was never provided such training.  His June 13, 2005 evaluation contains nothing in the "[a]ccomplishments" section, where she listed the two trainings that Ciarleglio had received, implying that Plaintiff had received nothing comparable.  In addition, both of Collins's two predecessors as well as his successor were offered off-site trainings, which all but Longo accepted.  Finally, although Sawyer testified that she and Job Corps "always" provide an employee an "opportunity to fix his deficiencies" and that her feedback to an employee would be documented and placed in the employee's personnel file, Collins's personnel file contains no documentation of Sawyer's (or anyone else's) evaluation, supervision, criticism, or direction of him until the day he was demoted.

A reasonable jury could conclude that these departures from regular procedures impacted the decision to demote Collins.  Schweikert testified that Collins followed directives, and evidence in the record supports conclusions that Collins wanted to be trained. Indeed, his response to Sawyer's June 13th evaluation was that it was unfair because she had promised but not provided him any training.

Moreover, by Plaintiff's telling, his predecessor and successor—each of whom were white men under age 40—were afforded better treatment than he.  In addition to their being offered and sent to training that was not offered to Collins, O'Sullivan and Ciarleglio were both treated more leniently than Collins.  Although Schweikert knew that Longo had twice caught O'Sullivan engaging in "romantic escapades" in dorm rooms, which conduct could appear to constitute "[e]ngaging in indecent behavior," a dischargeable offense,[16] O'Sullivan was never disciplined at all, let alone fired.  Ciarleglio was not disciplined when Sawyer learned he had skipped training and may have been with another Job Corps employee without authorization.  And when Sawyer expressed her dissatisfaction to Ciarleglio, she gave him four written warnings over the course of four months containing explanations of what he had done wrong or improperly failed to do, as well as directives of how to improve. The record is silent on whether Ciarleglio resigned or was fired, but it is clear from the record that Sawyer gave him opportunities to improve his conduct—consistent with Sawyer's

---

[16] At oral argument Defendants agreed that O'Sullivan's "romantic escapade" would be a dischargeable offense.

testimony that she "always" gave employees such opportunities—that she did not give to Collins.

Defendants' offer to reinstate Plaintiff as facilities manager after he filed formal and informal internal complaints and sent letters to Rep. DeLauro and the U.S. Department of Labor further counsels in favor of finding that Collins has proffered sufficient evidence to survive summary judgment on his discrimination claim.  An issue of material fact may be raised as to the discriminatory motivation behind an adverse employment action where an employer takes an employment action that *benefits* a plaintiff (here, reversal of the demotion) only after receiving the plaintiff's complaint that the opposite action (here, demotion) was discriminatory.  *See Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 383 (S.D.N.Y. 2002) ("Finally, Perez's receipt of a merit upgrade after she commenced this litigation may raise a material issue of fact as to why she was not given the promotion at an earlier date." (citing *Polley v. Fed. Reserve Bank*, No. 92 Civ. 7114, 1994 WL 465923, *6 (S.D.N.Y. Aug. 23, 1994) (finding that there was an issue of material fact as to whether plaintiff was subject to discrimination where plaintiff was only promoted after she filed an internal complaint))).

This record evidence could support either conclusion—that when Sawyer demoted Collins, Job Corps did or did not discriminate against him on the basis of his race or age. Drawing the inferences in favor of the non-moving party as required on summary judgment, this record thus satisfies Plaintiff's burden to proffer sufficient evidence to substantially

attack the credibility of Job Corps's assertion that he was demoted for the reasons it has

proffered, and therefore to raise a factual question to be resolved by a jury regarding Job

Corps's true motivation in demoting him.  Therefore, Defendants' motion for summary

judgment will be denied as to Plaintiff's discrimination claims.

B.    Retaliation

"The *McDonnell Douglas* burden shifting analysis used in claims of discrimination

in violation of Title VII also applies to retaliation claims brought pursuant to Title VII" as

well as the ADEA, *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003), and the parties agree

also applies to retaliation claims brought under CFEPA, *see Brittell*, 247 Conn. at 164 (Title

VII and CFEPA are "coextensive"); *see also Kearney v. City of Bridgeport Police Dep't*, 573

F. Supp. 2d 562, 573 (D. Conn. 2008) ("Claims under CFEPA are analyzed in the same

manner as those under Title VII," including for claims of retaliation).

> To establish a *prima facie* case of retaliation under Title VII, a plaintiff is
> required to show by a preponderance of the evidence: (1) that he participated
> in a protected activity; (2) the defendant knew of the protected activity; (3)
> he experienced an adverse employment action; and (4) a causal connection
> exists between the protected activity and the adverse employment action.

*E.g.*, *Nieves v. Angelo, Gordon & Co.*, 341 F. App'x 676, 679 (2d Cir. 2009) (citing *Cifra v.*

*Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *accord Terry*, 336 F.3d at 141.  Where, as

here, a plaintiff relies on temporal proximity to establish the fourth element of the *prima*

*facie* case, the temporal proximity must be "very close."  *Clark County School Dist. v.*

*Breeden*, 532 U.S. 268, 273–74 (2001).  Like his burden to establish a discrimination claim,

39

a plaintiff's burden to establish a *prima facie* case of retaliation is *de minimis*.  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

Defendants concede that Plaintiff has shown the first three elements of a *prima facie* case of retaliation.  Although they argue that he has not shown the fourth element of a "causal connection between [his] complaints of discrimination and his termination," their argument expressly focuses on step three of the *McDonnell Douglas* test—they assert that "'temporal proximity, standing alone, is insufficient to carry plaintiff's burden at *step three* of the *McDonnell Douglas* analysis'" (Defs.' Mem. Supp. at 25–26 (quoting *Bombero v. Warner–Lambert Co.*, 142 F. Supp. 2d 196, 210 n.28 (D. Conn. 2000)) (emphasis added))—which suggests that they take issue not with Plaintiff's *prima facie* case, but with the sufficiency of his evidence that their proffered nonretaliatory motives are pretextual.

In any event, the record supports the conclusion that Collins has met his *de minimis* burden to show a *prima facie* case based on temporal proximity.  One of the last letters that Collins wrote to complain of discrimination was his August 24, 2005 letter to the EEOC, in which he asserted that he "ha[d] been discriminated against on [his] job because [he is] black/male over the age of fifty, and treated differently in comparison to previous white males that held the same position."  (Ex. Collins–S.)  He sent a copy of that letter to Schweikert.  In addition, Job Corps received a copy of the CHRO's September 19, 2005 acknowledgment of Plaintiff's September 6th complaint of racial and age discrimination. (*See* Ex. Collins–W.)  He was fired less than two months after the CHRO's

acknowledgment—a duration shorter by a month than what the Second Circuit has held is "a time short enough to infer causality in some cases" involving claims of First Amendment retaliation. *See Pavone v. Puglisi*, No. 09-0109-cv, 2009 WL 3863362, *2 (2d Cir. Nov. 19, 2009) (citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980)); *see also Gorman–Bakos v. Cornell Co–op Extension of Schenectady County*, 252 F.3d 545, 554–55 & n.5 (2d Cir. 2001) (collecting cases, including those holding that a causal connection could be inferred from gaps substantially longer than three months); *see also Little*, 210 F. Supp. 2d at 386 & n.45 (collecting cases and holding that two-month interval suffices for *prima facie* case). This is especially so in the circumstances present in this case, because "[a] court may overlook a longer gap in time between protected conduct and an adverse employment action where 'the pattern of retaliatory conduct begins soon after the filing of the [ ] complaint and only culminates later in actual discharge.'" *Mody v. Gen. Elec. Co.*, Civ. No. 3:04cv358(JCH), 2006 WL 413439, *10 (D. Conn. Feb. 21, 2006) (quoting *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (alteration in *Mody*).

Defendants have produced evidence of a legitimate, nondiscriminatory rationale for discharging Collins: he "fraternized" with two students and loaned one student five dollars, each of which are dischargeable offenses under the employee handbook.

In considering whether Plaintiff has adduced evidence sufficient for a reasonable jury to conclude that Job Corps's rationale was pretextual, the Court again considers Defendants' argument that temporal proximity is insufficient to infer that the rationale was pretextual.

41

*Cf. Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002) (explaining that because the first and third steps "tend to collapse as a practical matter under the *McDonnell Douglas* framework," a defendant's arguments in these steps may be treated both "an attack on [a plaintiff's] prima facie case" and "an attack on a claim of pretext"). However, Collins does not rely on temporal proximity in arguing that the proffered nondiscriminatory rationale is pretextual:

> Defendants state very generally that their discipline and termination of Collins was warranted because he violated clear policy. Yet, since (1) Collins was misled about the basis for his discipline; (2) he was disciplined for things for which no employee had been disciplined; (3) he was disciplined more harshly than employees who engaged in comparable or more egregious behavior; (4) he was disciplined multiple times at increasing levels of discipline for the identical conduct; and (5) [D]efendants' investigation failed to investigate or give any credence to Collins'[s] version of events, these reasons are clearly pretextual.

(Pl.'s Opp'n at 34.)

At the third stage of the *McDonnell Douglas* test, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited [retaliation] occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000); *see also Reeves*, 530 U.S. at 150.

A fair conclusion could be drawn "from the perspective of the entire record," *Byrnie*, 243 F.3d at 105, and the full chronology of events between January and November 2005 that Defendants terminated Collins in retaliation for his complaints. When Collins was demoted on June 13, 2005, he had been employed by Job Corps for 15 months, for which period

Defendants have no record of any instance in which he was reprimanded for inappropriate conduct. Even though Sawyer testified that she provided frequent feedback to her employees in the form of documents in the employees' personnel files, no reprimands or disciplinary actions were taken against Collins through June 2005 aside from Sawyer's performing the June 13th evaluation, which addressed his work and interpersonal skills but not his behavior.

The circumstances changed as soon as Collins filed his complaint on June 29th. Sawyer began having frequent meetings with him regarding his "aggressive" or "volatile" behavior—conduct for which the record contains multiple references and reprimands but that is actually described only once (in Maroney's memo reporting Collins's behavior at the union meeting on request by Perez and Sawyer because they were excluded, references to which Schweikert stated she removed from Collins's file)—and began reprimanding him for that behavior. In addition, although Sawyer "was aware" that Plaintiff and Longo had changed a lock six weeks before the July 1st meeting, she never said anything about it until she summoned him to a meeting just two days after Collins filed his internal grievance on June 29th, when she reprimanded him for it.

After Perez, Boyle and other Job Corps managers sought the advice of counsel regarding Collins in a July 8th conference call, which was four days after Rep. DeLauro acknowledged Collins's letter and told him that she was "making the appropriate inquiries," Perez and Sawyer summoned Collins to another meeting on July 18th, where they again discussed the lock-changing incident as well as his having given Ortega a ride back to

43

campus.  The next day, within fifteen minutes of his return to campus, Sawyer summoned him to a third meeting in less than three weeks, where she and Perez documented the lock-changing and ride-offering incidents.  Sawyer again reprimanded Collins for his behavior, describing his conduct in previous meetings as a "sever[e]" offense and imposing a three-day suspension without pay.  On July 27th, one day after hearing back from counsel, Perez, Sawyer, and Schweikert offered to reinstate Plaintiff, but while that offer was outstanding they also issued him yet another written reprimand regarding his behavior.

Soon after Plaintiff rejected the reinstatement offer and sent a second set of grievances and letters regarding what he characterized as discriminatory treatment, Schweikert's superior, Dunham, discussed the matter with Collins and instructed Schweikert to hold a meeting with Collins about his treatment.  Although they held the meeting, Schweikert only addressed other matters.  On August 29th, five days after Collins sent a letter of complaint to the EEOC with copy to Schweikert, Perez met with Collins and his union representative and offered to reduce (but not eliminate) the discipline imposed on him the previous month.  Collins rejected the offer, notified Dunham, and filed a CHRO complaint.

The absence of any discipline against Collins pre-dating his complaints and letters in the Summer of 2005, in contrast multiple discipline-related meetings post-dating his complaints and letters, could lead a reasonably jury to conclude that Perez, Sawyer, and Schweikert's treatment of Collins starting in July and culminating in his November discharge

was a response not to Collins's conduct in meetings—which had never before been a documented issue—but to his complaints of discrimination, and could further conclude that they responded by building a sizeable negative personnel file on him as a basis to fire him.

This conclusion would be bolstered by the inconsistency in the reasoning Sawyer, Perez, and Schweikert used on November 17th for firing Collins. Each gave different reasons for rejecting Collins's version of the incident with Hester. Only Perez found him not credible based on her theory of the half-life of currency lying on the campus grounds. Sawyer and Schweikert, by contrast, had their own views as to what he should have done with the money. While the handbook lists fraternization and loaning money to students as a dischargeable offenses, Collins's and Hester's descriptions are at least equally consistent with a gift, not loan, and his explanation that his return to campus to campus to deliver breakfast to his girlfriend, not to "check up" on Hester, was consistent with Schweikert's knowledge about Plaintiff's campus breakfast deliveries. Nonetheless, without having conducted an investigation into Hester's statement,[17] they simply disbelieved Collins and determined that he both loaned Hester money and was fraternizing with her—according to Sawyer's logic, because "why [else] would you come back to see the student?" (despite his breakfast-delivery answer)—concluded that he committed dischargeable offenses.

_____

[17] Although Defendants correctly point out that Perez testified that she had a follow-up conversation with Hester after receiving Hester's statement but before firing Collins (*see* Defs.' Reply Supp. [Doc. # 92] at 3 (citing Perez Dep. at 162)), the record also supports a conclusion favorable to Plaintiff that no one discussed Hester's statement with Hester before firing Collins (*see* Hester Dep. at 29).

A jury comparing Defendants' treatment of Plaintiff's alleged misconduct in comparison to Schweikert's and Sawyer's failure to impose discipline for more egregious conduct by facilities managers who had not complained of discrimination, could conclude retaliatory motivation. Schweikert imposed no discipline when she learned that O'Sullivan had twice engaged in "romantic escapades" on campus (a dischargeable offense), and Sawyer imposed no discipline when she learned that Ciarleglio had skipped training in San Diego and had brought along another Job Corps employee without authorization.

In addition, although Collins was discharged for "fraternizing" with Ortega and Hester, Job Corps had imposed fraternization-based discipline in only three other, inferrably more serious instances: abetting students' drug- and alcohol-infused "hotel escapade," bringing a student to an employee's home, and bringing 20 students to a private cookout without authorization.

The record supports a conclusion that Job Corps's post-complaint disciplinary treatment of Collins contrasts sharply with its pre-complaint treatment of him. For example, "Perez' testimony makes it clear that any fraternization or having a student in a vehicle would have been grounds for termination right then and there" for the June 27th conduct, but "Collins was given the benefit of [the] doubt based on his claimed lack of understanding." (Defs.' Reply Supp. at 3 (citing Perez Dep. at 156–57).) After Collins began filing his letters and complaints, Perez, Sawyer, and Schweikert determined not to give him "the benefit of [the] doubt" in the incident involving Hester even though it involved conduct

46

dissimilar to the pre-complaint Ortega incident.  Similarly, although on June 13th Sawyer and Schweikert determined to demote rather than fire Collins because the latter "would leave him with no job" (Schweikert Dep. at 57–58), they offered him no sympathy after he had sent his letters and filed his complaints.

In sum, the record provides sufficient basis for a reasonable jury to conclude that Collins's discharge on November 17th was the culmination of months of post-demotion treatment by Sawyer, Perez, and Schweikert that was motivated by Collins's sending letters and filing complaints, and thereby engaging in protected activity.  For this reason, Defendants' motion for summary judgment as to Plaintiff's retaliation claim will be denied.

III.   Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. # 80] and Plaintiff's Motion to Seal Exhibit BB [Doc. # 88] are DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of February, 2010.